UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DANNY K. MCCRANEY                                    CIVIL ACTION

VERSUS                                               NUMBER: 15-03368
                                                     c/w 15-03369

MEGAN J. BRENNAN,                                    SECTION: "B"(5)
POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE (SOUTHWEST AREA)

## ORDER AND REASONS

Before the Court are the Rule 56 motions for summary judgment of Defendant, Megan J. Brennan, Postmaster General of the U.S. Postal Service ("USPS"). (Rec. docs. 23, 24).[1/] Those motions, accompanied by supporting memoranda and by separate statements of undisputed facts as respectively required by Local Rules 7.4 and 56.1, were previously noticed for submission in conformity with Local Rule 7.2. (*Id.*). Also before the Court is a filing from *pro se* Plaintiff, Danny K. McCraney, denominated "Motion for Reconsideration" (rec. doc. 28), which reads in part as a request for reconsideration of the Court's prior order dismissing Defendant's motion to compel as moot. (Rec. doc. 26). As so construed, Plaintiff's filing was not noticed for submission as required by Local Rule 7.2 or accompanied by a proposed order as provided for by Local Rule 7.3, was unaccompanied by a separate supporting memorandum as mandated by Local Rule 7.4, and does not even bear a certificate of service as Local Rule 5.4 requires. Otherwise, Plaintiff's filing appears to be a response to one or both of Defendant's motions for summary judgment which contains no separate statement of material facts under Local Rule 56.2 and was filed untimely under Local Rule

---

[1/] The motions are before the Court upon the consent of the parties pursuant to 28 U.S.C. §636(c). (Rec. doc. 16 in No. 15-CV-3368; rec. doc. 127 in No. 15-CV-3369).

7.5 without leave of court being first obtained. The foregoing rules violations notwithstanding, it is ordered, for the reasons that follow, that Defendant's motions be granted and that this consolidated matter be dismissed.

The above-captioned matter had its genesis on August 7, 2015 when Plaintiff tendered to the Clerk of Court two separate *pro se* complaints. In the lower-numbered of the two complaints, Plaintiff alleged that his employer, the USPS, had violated his "... rights ... [against] constant on the job harassment and discrimination after returning to work on a last chance agreement," for which he sought $300,000 in damages. (Rec. doc. 1 in No. 15-CV-3368). Plaintiff attached to his complaint a copy of a decision of the U.S. Equal Employment Opportunity Commission, Office of Federal Operations ("EEOC-OFO"), denying his request for reconsideration of the previous denial of an EEO complaint wherein McCraney alleged that his employer had discriminated against him on the basis of reprisal by subjecting him to a hostile work environment. (Rec. doc. 1-1 in No. 15-CV-3368). Examples of such a hostile work environment included Plaintiff being given a schedule for his breaks and lunch; being given an investigative interview on February 25, 2012; being threatened with an investigative interview on April 11, 2012 if he missed the appointed dispatch time; being threatened with an investigative interview and the summoning of Postal Police on April 12, 2012 if Plaintiff drove by a management official again on his tow motor without blowing his horn; being falsely accused of threatening a co-worker on April 18, 2012; and, being given an investigative interview, denied union representation, and being subjected to management delay in the awarding of a detail assignment on April 25, 2012. (*Id.*).

In the higher-numbered of the two complaints that he filed, Plaintiff charged his employer with violating his rights "... by not following appropriate policy and procedures

which includes the 'Zero [T]olerance Policy.'" (Rec. doc. 1, p. 1 in No. 15-CV-3369). Plaintiff alleged that he had been placed on non-pay status at the USPS for 14 months after being falsely accused of threatening a supervisor, an accusation that was not borne out by the evidence. (*Id.*). Plaintiff further alleged that management staff failed to conduct an investigation, failed to make a threat assessment, and failed to obtain a statement from him on the night of the incident, resulting in him having no income for 14 months while management investigated the incident, which was never validated. (*Id.*). Damages were approximated to be $250,000. (*Id.* at p. 2). Plaintiff attached to his complaint a copy of an administrative decision of the EEOC-OFO denying his request for reconsideration in that separate matter. (Rec. doc. 1-1 in No. 15-CV-3369). In that decision, the EEOC-OFO summarized Plaintiff's EEO complaint as "… alleging that the Agency discriminated against him on the basis of race (African American) when, on August 25, 2010, he was placed off the clock in a non-pay status; and on September 13, 2010, he was issued a notice of removal, effective October 22, 2010." (*Id.*).[2/] Before turning to the standards governing the review of Plaintiff's substantive claims, the specific instances of discrimination alleged by him, and the arguments advanced by Defendant in her motions, the Court first recalls the law applicable to Rule 56 motions.

Under Rule 56(a), summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986). "'Procedurally, the party moving for summary judgment bears the initial burden of informing the district court of the basis for its

---

[2/] In an omitted footnote, the EEOC-OFO noted that Plaintiff had "… grieved his removal and was subsequently reinstated on November 1, 2011, pursuant to a last chance agreement." (Rec. doc. 1-1, p. 1, n. 1 in No. 15-CV-3369).

3

motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Langlinais v. Coleman*, No. 13-CV-3003, 2015 WL 225222 at *1 (E.D. La. Jan. 15, 2005)(citing *Taita Chemical Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001)). The party opposing summary judgment must then "… go beyond the pleadings and by[his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. "The Court has no duty to search the record for evidence to support a party's opposition to summary judgment; rather, '[t]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim.'" *Langlinais*, 2015 WL 225222 at *1 (quoting *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)). That burden is not satisfied by "…'some metaphysical doubt as to the material facts,' … by 'conclusory allegations,' … by 'unsubstantiated assertions,' … or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(citations omitted). The nonmovant "… must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case; naked assertions of an actual dispute will not suffice." *Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 950 (5th Cir. 1998).

In *Rowe v. Jewell*, 88 F.Supp. 3d 647, 671-73 (E.D. La. 2016), Chief Magistrate Judge Wilkinson of this Court noted the distinction between causes of action premised on a hostile work environment and those based on retaliation and the different frameworks under which those causes of action are analyzed. The court in *Rowe* went on to observe, as did the Fifth Circuit in *Bryan v. Chertoff*, 217 Fed.Appx. 289, 293 (5th Cir. 2007), that various other circuits

4

had previously recognized a Title VII cause of action for retaliatory hostile work environment. *Id.* In the absence of a more definitive decision from the Fifth Circuit on the subject, the court in *Rowe*, just as other district courts in this circuit had done, assumed the existence of a cause of action for retaliatory hostile work environment to which was applicable a modified version of the standard governing traditional hostile work environment claims. *Id.* Accordingly, in order to make out a successful retaliatory hostile work environment claim, a plaintiff would need to establish that: 1) he engaged in protected activity; 2) he was a victim of harassment; 3) a causal connection exists between the harassment and the protected activity; 4) the harassment affected a "term, condition, or privilege" of his employment (*i.e.*, the harassment was so severe or pervasive as to alter the conditions of his employment and to create an abusive working environment); and 5) the employer knew or should have known of the harassment and failed to take prompt remedial action.[3]

In adopting the modified framework to be applied to retaliatory hostile work environment claims, the *Rowe* court cited with approval *Growski v. Peake*, 682 F.3d 1299, 1312-13 (11th Cir. 2012), which equated the "severe or pervasive" element of the test with the "adverse employment action" prong of a prima facie case of retaliation: "'the actions complained of were sufficiently severe or pervasive to alter the terms and conditions of employment, thus constituting an adverse employment action.'" *Rowe*, 88 F.3d at 674 (quoting *Gowski*, 682 F.3d at 1312). The *Gowski* Court had also held that "but-for causation,"

---

[3] The court in *Rowe* further observed that "where the harassment is allegedly committed by a supervisor with immediate or successively higher authority, the plaintiff employee needs to satisfy only the first four of the elements listed above." *Rowe*, 88 F.Supp. 3d at 673 n. 5 (internal quotations and citations omitted). In his most recent filing, Plaintiff does not challenge the applicability of the modified framework espoused in *Rowe*.

5

which is the third, pretext element of a retaliation claim, "... still 'matters in a retaliatory hostile work environment claim – that is, the severe and pervasive accumulation of actions that would not have occurred but-for the retaliatory reason, even if each action alone was justifiable.'" *Id.* (quoting *Gowski*, 682 F.3d at 1313)(footnote omitted).[4/]

With the foregoing standards in mind, the Court turns to the specific incidents of alleged harassment complained of by Plaintiff. He first complained that he was given a schedule within which to take breaks and lunch. According to the 28 U.S.C. §1746 declaration of Yvette Bradley, an attorney with the Southern Area Law Department of the USPS whose duties include representing the interests of the USPS in EEO proceedings and maintaining the records of such proceedings, on November 1, 2011, Plaintiff had returned to work pursuant to a "Last Chance Agreement" after a 14-month absence. (Rec. doc. 24-2). As part of the inquiry into Plaintiff's charge of discrimination, investigative affidavits were obtained from various USPS employees whom Plaintiff had identified as the responding management officials. (*Id.* at pp. 1-2). Among those officials was Orlando Reed ("Reed"), Manager of Distribution and Operations ("MDO") at the New Orleans Processing & Distribution Center ("PD&C") and one of Plaintiff's second-line supervisors. (*Id.*). In his affidavit, Reed explained that prior to November 17, 2011, Plaintiff had no break/lunch schedule at all and that he had complained of working all night and not getting a break or lunch. (Rec. doc. 24-3, p. 3). Accordingly, Plaintiff was given a set schedule for lunch and two breaks. (*Id.* at p. 23). This accommodation, made in response to Plaintiff's specific complaint, can hardly satisfy the "severe or pervasive" element of the retaliatory hostile work environment test.

---

[4/] The *Rowe* court noted that the correct standard is "severe <u>or</u> pervasive," not severe <u>and</u> pervasive. *Rowe*, 88 F.3d at 674 n. 6 (citing *Harvill v. Westward Communications, LLC*, 433 F.3d 428, 434 (5th Cir. 2005)(emphasis added).

6

Next, Plaintiff complained that on February 25, 2012, he was given an investigative interview. As established by Defendant's summary judgment materials, Andrew Lea ("Lea"), Plaintiff's supervisor, was instructed by Reed to conduct an investigative interview of Plaintiff in connection with the Reed's belief that Plaintiff was delaying the dispatch of mail. (Rec. doc. 24-3 at p. 41). After conducting the interview, Lea explained to Reed that at that time, the docks were congested and that Plaintiff had to drive with greater care so as not to hit anyone. (*Id.*). Lea further attested to the fact that all information pertaining to the incident had been destroyed and that no further action was taken. (*Id.*). An internal investigation of an employee's conduct is not sufficiently severe to alter a term, condition, or privilege of his employment. *McGarry v. Univ. of Miss. Med. Ctr.*, 355 Fed.Appx. 853, 858 (5th Cir. 2009)(citing *Shepherd v. Comptrollers of Pub. Accounts*, 168 F.3d 871, 872-74 (5th Cir.), *cert. denied*, 528 U.S. 963, 120 S.Ct. 395 (1999)).

Plaintiff next complained in his EEO complaint that on April 11, 2012, he was threatened with an investigative interview if he missed the dispatch time. In his investigative affidavit of October 12, 2012, Reed attested to having no knowledge of Plaintiff's accusation or of any counseling or discipline being meted out in connection with the missing of dispatch time. As noted above, even if an investigative interview had occurred, it would not be actionable under Title VII. *McGarry*, 355 Fed.Appx. at 858.

In his next specification of reported discrimination, Plaintiff alleged that on April 12, 2012, that he was subjected to an investigative interview and that "management" threatened to summon the Postal Police if Plaintiff drove by a certain official again on his motor tow without blowing his horn. A review of the exhibits attached to Defendant's motion reveals that on the aforementioned date at 5:10 a.m., Rosia Thomas ("Thomas"), a Distribution

Operations Supervisor at the New Orleans PD&C, conducted a 20-minute interview of Plaintiff, in the presence of a union representative, in connection with a complaint of willfully delaying the mail the previous day. (Rec. doc. 24-3, pp. 26-27, 37-38). At the interview, Plaintiff was asked if he knew that the mail had not been dispatched from the small parcel bundle sorter the day before when the mail had been ready, thus causing delayed mail distribution for the New Orleans PD&C. (*Id.*). Plaintiff responded that dispatching the mail was not his responsibility when he was on a scheduled break and that Reed had caused the delay by not assigning another employee to dispatch the mail while he was so indisposed. (Rec. doc. 24-3 at p. 37).

Approximately one hour following Thomas' interview, Plaintiff was observed to drive his motor tow within 2.5 inches of Reed's backside, almost hitting him, at a time when the aisle was clear and there was no congestion or anyone else driving or in the way. (Rec. doc. 24-3 at p. 20). Plaintiff was notified of the occurrence by Reed and was told that he must have a tow motor with a working horn and that he was expected to obey all safety rules. (*Id.* at pp. 20, 21). Reed also placed Plaintiff "on notice" with respect to his provocative actions and advised him that such behavior would not be tolerated in the future. (*Id.*). In his investigative affidavit, Reed denied threatening to call Postal Police if Plaintiff drove by him again without blowing his horn. (*Id.* at p. 9).

As set forth in the USPS' "Postal Employee's Guide to Safety," workers are prohibited from operating vehicles such as tow motors "in a reckless manner" and are specifically directed to "[s]ound your horn to warn pedestrians of your approach." (Rec. doc. 24-3, pp. 93-94). The Agency's "Postal Service Policy on Workplace Harassment" further provides that "[a]llegations involving any possible criminal misconduct should be reported to the

appropriate law enforcement authorities as follows: any physical misconduct relating to workplace harassment (*i.e.*, any physical assault, threat of a physical assault, or striking) should be reported to the Postal Inspection Service, ..." (*Id.* at pp. 96-97). Here, again, the conducting of an investigative interview by Thomas and the admonition of Plaintiff by Reed following the "near miss" on April 12, 2012 fail to rise to the level of actionable severe or pervasive conduct. *McGarry*, 355 Fed.Appx. at 858.

Next, Plaintiff alleged that on April 18, 2012, he was falsely accused of threatening a co-worker. According to the investigative affidavits of Thomas and Joseph Chaney, the Manager of Distribution Operations, Tanish Watson, a full-time mail handler, reported to her supervisor, Andrew Lea, and a union representative, LaJune Smith, that Plaintiff had tried to run into her motor tow. (Rec. doc. 24-3, pp. 30, 57). Upon learning of the reported incident, Plaintiff and Watson were brought into the office for questioning and remained segregated until an investigation could be conducted and completed. (*Id.* at p. 31). At some point in the process, both parties agreed that they were able to work together and both refused to give a written statement. (*Id.* at p. 32). Plaintiff received no discipline as a result of the incident. (*Id.*). The investigative efforts taken by USPS officials in response to a report from one of their employees, particularly where no disciplinary action of any kind was taken, were not sufficiently severe or pervasive so as to alter the terms and conditions of Plaintiff's employment.

Finally, Plaintiff alleged that on April 25, 2012, he was given an investigative interview at which he was denied union representation and that management delayed awarding him a detail assignment. Among the summary judgment materials relied upon by the Defendant is the investigative affidavit of Michael Gardner ("Gardner") who, at all

9

relevant times, was the Lead Manager of Distribution Operations at the New Orleans P&DC and Plaintiff's third-line supervisor. (Rec. docs. 24-2, p. 2; 24-3, pp. 69-80). In that capacity, Gardner was responsible for selecting from a pool of applicants, which included Plaintiff, an employee to work an upcoming detail in St. Rose. (Rec. doc. 24-3, p. 74). After going through the list of applicants, Gordon believed that there were several other mailhandlers whom he felt were more qualified for the position, given that the post was to be in an environment without supervision. (*Id.*). Gardner admits that he was initially unaware of the pecking order of details for the mailhandlers. (*Id.* at p. 76). After being informed of the hierarchy by union officials and speaking with the union president about the contract, Gardner immediately corrected the error, recalled the initially selected female employee, and put Plaintiff in the St. Rose detail, even calling Plaintiff into his office to apologize for the situation. (*Id.* at pp. 74-76). The error resulted in a delay of approximately two weeks in Plaintiff beginning the detail. (*Id.*). Plaintiff never notified Gardner that he believed the delay was harassing or that it subjected him to a hostile work environment and Gardner was not involved in any investigative interviews that may have been conducted on April 25, 2012. (*Id.* at pp. 71-72). However, during such processes, employees are afforded the opportunity to have union representation and the USPS generally furnishes employees with such representation unless the employee declares that he does not need union representation. (*Id.* at p. 73).

"In order for harassment to affect a term, condition or privilege of employment, it must be 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *McGarry*, 355 Fed.Appx. at 858 (quoting *Harris v. Forklift Systems*, 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993)). To be actionable under Title VII, the challenged conduct must be both objectively offensive, meaning that a

10

reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so. *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.), *cert. denied*, 528 U.S. 963, 120 S.Ct. 395 (1999). "Title VII ... does not set forth a general civility code for the American workplace." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006)(internal quotation marks and citation omitted).

Based on its review of the materials submitted by the parties, the Court concludes that the incidents of alleged discrimination complained of by Plaintiff were not sufficiently severe or pervasive, particularly from an objective standpoint, to sustain a claim for a retaliatory hostile work environment. *Shepherd*, 168 F.3d at 872-74 (offensive and boorish conduct spawning over a year did not qualify as severe or pervasive). Disciplining an employee for performance issues is not a hostile act when consistent with the employer's workplace policies, *Tejada v. Travis Assoc. for the Blind*, No. 12-CV-0997, 2014 WL 2881450 at *5 (W.D. Tex. June 25, 2014), *adopted*, 2014 WL 4165370 (W.D. Tex. Aug. 7, 2014), and, as noted earlier, an internal investigation of an employee's conduct is not sufficiently severe to alter a term, condition, or privilege of employment. *McGarry*, 355 Fed.Appx. at 858. Because Plaintiff fails to establish a *prima facie* case, summary judgment on his hostile work environment claim is warranted.[5]

In the second-filed of his two lawsuits, Plaintiff alleged that he was discriminated against on account of his race (African-American) when he was taken off the clock and placed

---

[5] In light of this finding, the Court pretermits consideration of Defendant's argument regarding the third element of the *prima facie* case.

in non-pay status on August 25, 2010 and was subsequently issued a notice of removal on September 13, 2010 that was effective on October 22, 2010.

Among the competent summary judgment materials submitted by Defendant is the witness investigative affidavit of Millicent Sylve ("Sylve"), Plaintiff's supervisor at the time, who identifies herself as African-American. (Rec. doc. 23-3, pp. 1-8). On August 28, 2010, Plaintiff was a tow-motor operator whose duties included pulling containerized mail within the P&DC. (*Id.*). At approximately 2:45 a.m. on that date, Sylve instructed Plaintiff to pull an All Purpose Container ("APC") upstairs for processing. (*Id.*). In response to this verbal command, Plaintiff stated that he had other mail to get first. (*Id.*). Upon repeating her directive, Plaintiff ignored Sylve and continued to go about his business. (*Id.*). When Sylve instructed Plaintiff that her work directive should be heeded, Plaintiff replied "[n]o," that he would do his job the way he wanted to. (*Id.*). After Sylve repeated the simple requirement that Plaintiff follow her workplace instructions, Plaintiff became very angry and stated "[l]eave me the f*** alone and get out of my f***ing face." (*Id.*). Sylve then ordered Plaintiff to get off his tow motor and to meet her in the office of Reed. (*Id.*). When Plaintiff turned and swung around to get off the tow motor, Sylve thought that he was reaching for an object of some kind and was thus fearful for her safety. (*Id.*). Sylve therefore called Reed and asked him to meet her in the office with security. (*Id.*). After waiting until Plaintiff was out of sight, Sylve asked a co-worker to escort her to the office. (*Id.*). When she arrived there, Plaintiff still had not made his way to the office as he had been instructed. (*Id.*).

Sylve then advised Reed that Plaintiff had not reported to the office as directed and that he had previously ignored her valid workplace orders, had used profanity towards her, and had made movements that made her feel physically threatened. (Rec. doc. 23-5, p. 2).

Reed proceeded to search for Plaintiff and found him on the dock where he acknowledged that Sylve had ordered him to the office which he had not done as "... he said he had something to do." (*Id.*). In response to Reed's question, Plaintiff freely admitted to cursing his supervisor but denied attempting to hit Sylve with anything, explaining that he "... was picking up my water bottle." (*Id.*). Reed reminded Plaintiff of the Agency's Zero Tolerance Policy and told him he would have to go home. (*Id.*). Plaintiff was escorted off the premises by security pending further investigation (rec. doc. 23-3, p. 2) and he was subsequently provided, via certified mail, notification of the emergency procedure resulting in his placement in off-duty status and his right to appeal that action to the Merit System Protection Board ("MSPB") if he so chose. (Rec. doc. 23-6). In a written statement, Plaintiff stated that he had warned Sylve not to harass him and that if she continued to do so, he would call security on her. (Rec. doc. 23-8).

On September 15, 2010, Thomas issued a notice of removal to Plaintiff advising him that he was being terminated from the employ of the USPS effective October 22, 2010. (Rec. doc. 23-9). That removal was predicated upon two charges: 1) failure to follow instructions and 2) unacceptable conduct. (*Id.*). In issuing the notice of removal, Thomas had reviewed a statement from Sylve and had also conducted an investigative interview of Plaintiff in which he admitted to failing to follow instructions but denied using profanity or making any threatening movements toward Sylve as he was only reaching for his water bottle. (Rec. doc. 23-4, p. 3). Thomas did not find Plaintiff's account of the incident to be credible and concluded that he had violated the Postal Service Standards of Conduct as set forth in the Employee and Labor Relations Manual, the Zero Tolerance Policy, and the New Orleans P&DC Office Rules. (*Id.*; rec. doc. 23-9). Reed was the reviewing and concurring official on

the Notice of Removal, and acted only after speaking with Thomas and reviewing the disciplinary proposal, a copy of the investigative interview of Plaintiff, and statements from Sylve and Plaintiff. (Rec. doc. 23-5, p. 5). In agreeing with the proposal to terminate Plaintiff, Reed simply found Sylve's account of the incident to be more persuasive and credible than Plaintiff's. (*Id.*).

Plaintiff alleges that he was placed on non-pay status and was ultimately removed from his post on account of his race. In cases based upon circumstantial evidence like the present one, claims of racial discrimination are analyzed under the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26 1973). *Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016).[6/] Under this three-step analysis, a plaintiff must first set forth a *prima facie* case of discrimination by demonstrating that: 1) he is a member of a protected group; 2) he was qualified for the position at issue; 3) he was discharged or suffered some adverse employment action by the employer; and, 4) he was replaced by someone outside of his protected group or was treated less favorably than other similarly situated employees outside the protected group. *Id.*

With respect to the fourth element of the *prima facie* case, the Fifth Circuit has offered the following guidance:

> [e]mployees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated. This is because we require that an employee who proffers a fellow employee as

---

[6/] Although *Morris* was a 42 U.S.C. §1981 proceeding, the analysis of claims brought under that statute and Title VII is the same. *Morris*, 827 F.3d at 400 n. 10; *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n. 2 (5th Cir. 1996).

14

> a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances." The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts* for the difference in treatment and received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.
>
> *Lee v. Kansas City Southern Railway Co.*,
> 574 F.3d 253, 259-60 (5th Cir. 2009)
> (footnotes omitted).

If the Plaintiff is successful in establishing a *prima facie* case, a presumption of discrimination arises and the burden of production, not persuasion, shifts to the employer to articulate a legitimate non-discriminatory reason for the challenged employment action. *Morris*, 827 F.3d at 400. "If the employer carries this burden, the 'inference of discrimination disappears and the plaintiff must present evidence that the employer's proffered reason was mere pretext for racial discrimination.'" *Id.* (quoting *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004)). Despite the burden-shifting analysis fashioned in *McDonnell Douglas*, the burden of proof in establishing "… that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093 (1981).

The Court has reviewed all of the materials that have been provided to it. The evidence establishes that Plaintiff, an African-American, was disciplined and removed from his position after he was repeatedly insubordinate to his supervisor, also an African-

15

American, following which he used expletives, engaged in behavior that was reasonably believed by her to be physically threatening, and disregarded additional directives to proceed to Reed's office. In the investigation that followed, Plaintiff freely admitted to cursing his supervisor and his removal was ultimately concurred in by Reed, also an African-American.

Moreover, the sole comparator cited by Plaintiff in his "opposition" memorandum did not engage in conduct that was nearly identical to that which Plaintiff exhibited (*i.e.*, multiple instances of insubordination and use of expletives and physical threat to supervisor, all occurring on the same day), thus accounting for the difference in the treatment that they received and rendering the alleged comparator not "similarly situated" for purposes of the fourth element of the *prima facie* case. *See Lee,* 574 F.3d at 259-60.[7]

Based upon these sworn statements and the absence of any countervailing evidence in the record, he Court finds that Plaintiff has failed to establish the fourth element of a *prima facie* case of intentional discrimination with respect to his placement on non-pay status and subsequent removal.

Even if that were not the case, the evidence utterly fails to establish that the discipline meted out to Plaintiff was merely a pretext for racial discrimination. For these reasons, it is

---

[7] The only individual mentioned as a comparator in McCraney's "opposition" is Danny Barber, but there is no evidence submitted to support that proposition. Indeed, the only evidence pertaining to this question that is at all helpful in this regard actually establishes that Mr. Barber is not a suitable comparator.
The affidavit executed by Sylve under penalty of perjury in the underlying EEO investigation indicates (1) that she did not know Barber's race, (2) that Barber had directed profane language toward Sylve in the past, (3) that Barber had *not* caused Sylve to feel threatened or unsafe and (4) that Barber had "never conducted himself in any way similar to" McCraney. (Rec. doc. 23-3 at 7). The record further establishes that McCraney was placed off duty by Reed specifically because he made Sylve feel threatened: McCraney's "refusal to follow instructions, his cursing of a supervisor, and the supervisor's perception that he made threatening movements amounted to a reasonable belief that he might be injurious to himself or others if he remained in a duty status." (Rec. doc. 23-5 at 2-3 (sworn statement of Orlando Reed)). These sworn statements are the only summary judgment evidence in the case that pertains the question whether Barber is a suitable comparator and it establishes he is not.

ordered that Defendant's motions for summary judgment are granted and that Plaintiff's suit is dismissed. Judgment will be entered accordingly.

New Orleans, Louisiana, this __17th__ day of _____April_____, 2017.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE